The next matter will be 15-1602, the United States v. Darren Stokes. Mr. Crashmore? Oh, there you are. All right. Take your time. Good morning, Your Honor. Good morning. Darren Stokes was charged with a mail-in-wire fraud, arousing out of a search of a mail that came chiefly to a post office box, but in addition to mail that was seized and retained from two addresses, one a business address for him at Middle Street and one a home address. It was a similar case that was brought by the American Dental Association under the Lanham Act. They claimed that Mr. Stokes was using marks that were confusing people and tricking them into paying faxed invoices or invitations to membership to him by sending checks as annual membership dues to the post office box address. The plaintiff in that case, the American Dental Association, sought a temporary restraining order and received it ex parte. In that order, Judge Wolf made certain conditions that the government, who was named as the person required to retain the mail, did not follow. First... Counsel, I thought you were here on a Fourth Amendment claim. The judge who denied your motion to suppress found that there probably wasn't a violation of Judge Wolf's order and in any event, it had nothing to do with the motion to suppress. So if you're going to build your case on a purported violation of Judge Wolf's order and not argue the Fourth Amendment issue, I don't think that would be wise. I know, Your Honor. Okay, can we get then to the Fourth Amendment issue? Sure. I'd like, if you don't mind, Judge Stern's order starts, In this puzzling motion, Defendant Darren Stokes seeks to suppress evidence, the contents of unopened mail that the government has committed not to offer at trial. I understand, Your Honor. So what precisely is the evidence that this motion to suppress is about? I do believe that might be a misstatement by the trial judge, that there actually is evidence that you are challenging on appeal that should have been suppressed. What is that evidence? Your Honor, I'd refer you to page 46 of the sealed record appendix. In that particular case, based on an interview by the police, they went and spoke with customer service supervisor David DeGrenier of the post office on January 17, 2012. He said in that case that they had pulled over 200 letters from the suspect's box and found there was $47,200 worth of checks in it. That's a fair suggestion that those envelopes had to be opened to determine that there were checks in that particular amount in it. And that was done on the day, and as I understand it... So you're saying that testimony should have been suppressed? That was not testimony, Your Honor. That was not testimony. That was an Exhibit L in support of the motion to suppress in the affidavit, showing that in fact, factually, there was a controversy. The government claimed that no envelopes were opened. We claimed they were opened and that the checks were looked at. The question is, what was put into evidence that you would like suppressed? The government claimed that none of those checks were going to be put into evidence. But the fact of the matter is, it's from that originating source. You're appealing from a case, there's a conviction. Yes. Was anything put into evidence in support of that conviction that you would like suppressed? If so, what was it? They put in unopened envelopes claiming that there were checks inside of those and that that was a logical permissible inference based on all they knew. What they knew was that there had been opened envelopes that contained checks in them before they ever seized all of these. Can I help focus you? There were some envelopes that were addressed to Mr. Stokes, correct? Yes. And none of those were ever opened. Is that correct? According to the government, according to Mr. Stokes, he believes that his Sprint envelopes were open and that portions of them were missing. That remains in controversy. The government denied it. The government filed affidavits to indicate that they were sealed. We never had a hearing on it and we never had that person be in. There were envelopes which were not addressed to your client. They were addressed to somebody else, but they were within the post office box. That's correct. All right. As to those envelopes, some of them were opened by the postal inspectors and the government represented that they had obtained consent from the sender of those envelopes. Is that correct? That's correct. All right. So what are we talking about? That they had no right to do that. When one looks at 404C, 404C specifically does not give the federal authorities, postal authorities, permission to inquire or request of the addressor, the sender, the right to open the mail. They're relying now, they did not then at the time of the hearing, rely upon the administrative regulation. But if you look at 404C, it specifically does not give that avenue of approach that they used and that was reexamined by the Congress in 2007, determining that no change was to be made to that statute. I thought you were here making a Fourth Amendment argument that your client had a privacy interest in whatever envelopes were put into evidence that were not addressed to your client but to someone else. Is that the argument you're making? Yes. And what I'm claiming is that the federal government had no right to exceed its authority. And has it somehow created a privacy right in your client? I believe that every human being has a reasonable expectation of privacy in all mail that is delivered to his postal box. The government relies on the Forrester case, but I believe that one is distinguished in my brief, and then they rely upon the, I think it's Obonesco, but it's a difficult name to pronounce. And in that case, in that case, there was a huge description, because there was a Fourth Amendment issue raised there, there was a huge description of the precise manner in which the mail is placed into that post box. Isn't that a problem for you? Because since you have the burden to show that it should be suppressed, all we know is that there were envelopes in a post office box. We don't know anything about the circumstances, about who gets access to that post office box, whether there's an opening backside to the post office box, whether there's a key that one has to have, we don't know any of that. So absent any of that evidence, why should we presume that the mail sitting in that box is something over which the recipient has a reasonable expectation of privacy? Well, we know there are cases in which you contract for some mail job, and we said that doesn't show alone that you have a reasonable expectation of privacy. And there are two reasons for that. First, that at the time the initial batch of envelopes was seized, no probable cause was established, unlike the Obonesco case. But if there's no expectation of privacy, you don't need to establish a probable cause. I understand. What's the second reason? In Obonesco, the court even assumed that she had the reasonable expectation of privacy of her husband, who was the person who rented the box. They assumed that in still, nevertheless, finding that what the authorities did in that case was permissible and okay. And in doing that, they found the specific circumstances in that case had been detailed, that they could go into the box, that some things were too big to put into the box, that some of the mail boxes, little boxes, had to be taken out to a... What I'm asking you is who doesn't the defendant have the burden in an uncertain... We're dealing not with a bedroom. We're dealing with an unusual space, a post office box. Yes. In which, unlike things that we treat as super private, we know third parties get to enter. Right? Yes. The workers there get to go in and out of it. So that needs to raise the question, do we really treat it as a place over which you have an expectation of privacy? Well, so who has the burden of demonstrating to us that this is the kind of post office box, if there could be one, over which we should assume there is a reasonable expectation of privacy, rather than the kind that might be so subject to people going in and out without any knowledge of the recipient of the mail, that it would be strange to think that they have a reasonable expectation of privacy. Well, while the plaintiff has a burden of proof to show... I'm sorry, the defendant has a burden of proof to show that his constitutional rights were in peril under the Fourth Amendment, the fact of the matter is that it would be those persons who actually extracted the mail from the box whose identity are unknown to him. The most he could write is what he wrote, both in an affidavit that I rented that box, I rented it for myself, and my mail came there, in addition to what he laid out from Judge Wolf's civil suit, because they gave... The way you just put it, I think, goes against your argument, because what you're suggesting is he has no idea whether people are going in and out of that box all day long. Right? But he has no idea that... Why would we think he has a reasonable expectation of privacy in the box? Would it be any different if he represented, look, I made a deal, I bought this box, and the condition was, very limited circumstance, somebody gets in it, like a safe deposit box or something like that. That I could understand. But I don't understand how, without any evidence at all, we just presume that because he doesn't know whether everybody's going in it whenever they want, we should assume he has an expectation of privacy? It would seem like we'd assume the opposite. I would think that the fact that there is a key to this box indicates ownership, dominion, and control, and a degree of privacy. By having a key to enter the box excludes those who don't have a key to enter the box. Is that true on both sides? No. Is there a back side to it? And that's something we don't know. There's no description of how they do it, except that what we do know is that the government has a limited right to enter the box. They certainly, for example, once again, if we go back to 404C, have no right to open all the contents of the material that come into that box. But that's because of the statute. That's because of the statute, but that statute limits, not empowers, the government. I understood you to be making a two-part argument. The first is whether the stuff in the box is opened or not, he has a privacy interest in that. No one can take that. And then the second part is, furthermore, the government cannot open the mail not addressed to him, even with the consent of the sender of the package to determine what's inside and to put into evidence what is inside. That's correct. Is that correct? That's correct, both sides. Okay. And the government has no right to open, even with the consent of the sender? That's correct. For what reason? Because 404C explicitly says... Are you making a privacy argument or are you making a different type of argument? I'm claiming, Your Honor, that any excess action unwanted by statute on the part of the postal offices either needs a probable cause basis to permit them to act as investigators or, alternatively, to follow their own statute, not through rules and regulations which enhance the statute but have no authority to do so. By having the administrative regulation, they enlarge 404C to include or even ask permission of the addressees. And that's not true. Even if you look at the way it's written under the administrative regulation, the request that it be opened must be made by the sender under certain circumstances in the administrative regulation. Instead, these people, the postal authorities, asked for permission to be able to open these. And that precludes the sender from making a request? No, but the sender didn't make a request. The sender simply acquiesced to the request of the government. What did the sender say? As far as we can tell in each of these interviews that are set forth here, the government asked whether or not they could have permission to open. And some of the initial people... You may finish. Some of the initial people they asked said, I better check with the person who sent the check. They were talking to the secretary as opposed to the boss. Others gave them permission directly, but once asked, they did not suggest. I think only Ms. Alba, in the way I read the interview, might possibly have said, it's okay to go ahead and do that. In the atmosphere of the interview, it sounds like she volunteered that. But that's the only person. None of the others did. Thank you. Mr. Balthazard, good morning. Good morning, Your Honors. My name is Mark Balthazard. I represent the government in this appeal. I would like to start by summarizing the mailing evidence. I think that might help the court understand a little more about what was going on. Ms. Thomas. Yes, Your Honor. Okay. It's evidence that was admitted. There was no evidence admitted. There was no trial in this case. The defendant pled guilty pursuant to a conditional plea, which allowed him the right to appeal the denial of the motion to suppress. Okay, but there was a hearing on the motion to suppress. There was no hearing. There was no hearing. I believe the defendant did not even request a hearing. The defendant filed a motion and a memorandum supported by a variety of documents, which he appended to it, including the defendant's affidavit. The government responded, opposing the motion to suppress, supplying some of its own evidence. The judge decided the motion and denied it without a hearing, determining that the defendant hadn't established a need for a hearing. But I believe there was not even a request for a hearing. Could you just help me understand, what is the connection between the conviction to which he pled and the motion to suppress? Perhaps I need to, if I can back up and perhaps describe the mail a little bit about the investigation. It would be helpful to me at least to hear the government's view of the facts. Yes, Your Honor. So the totality of the mail at issue, mail that was seized from three different locations, it was the 1483, the post office box in Brockton, that had the bulk of it. Then there were two other addresses, Willard Street in Quincy, which was actually the location of a Regis Corporation, a rent and office facility, and 3 Blaine Street in Brockton, which was a residence that Mr. Stokes owned. There were a total of approximately, roughly, 520 envelopes at issue. Of those, eight alone were addressed to Mr. Stokes, either his full name or D. Stokes. None of those envelopes were ever opened by the government, as the judge found below. None of the contents were used in connection with the government's investigation. And as the government represented to the district court below, in connection with the motion to suppress, the government represented it would not use those envelopes in its case at trial if the case were to go to trial. So that leaves approximately 512 additional envelopes. About 450 of them, let me back up, all of the rest of them, none of them were addressed to Mr. Stokes. The vast majority, all but two, were addressed to one of these business associations that are discussed in the briefs, American Dental Association, the American Trucking Association, etc. or one of their acronyms, and several of them were just addressed to membership services. Of those, about 450, as I said, were addressed or were sent to Box 1483 in Brockton. There were four of those that were actually opened with the consent of the sender in each case. Three of them formed the basis of mailing counts in the indictment, counts 9 through 11. Then there were about 30 envelopes that were obtained or that were not delivered to the Willard Street address. Those were all addressed to the National Association of Manufacturers or the acronym. One of those was opened, and that formed the basis of count 12 of the indictment. And then there were an additional 30 that were not delivered to the Blaine Street address. Those were addressed to APRA or ATA or the full names of those entities. Two of them were opened, and those formed the basis of counts 13 and 14 in the indictment. So that's the universe of the mailings that we're dealing with here. So am I understanding things right that if the open envelopes that you just described were suppressed, that would vitiate the convictions on those counts? If that was suppressed, I believe the defendant at least would have the right to withdraw his complaint to those counts. Are there any unopened envelopes that if we conclude would be suppressed, the government would take the view that also would give the defendant the right to suggest that the plea wasn't well taken? Or is the only thing that matters from the government's point of view the possible suppression of the open envelopes? If the court were to suppress all of the envelopes and everything flowing from that... That would include the open ones. I'm asking whether there are any unopened ones that are relevant to this appeal, where the suppression of them could affect the plea. I think if the court suppressed based on the conditional plea, the defendant would have the right to consider whether he wished to withdraw his plea. So I think it would have to go back to the district court. The defendant has the right under the rule to withdraw his plea if his appeal on the motion to suppress is successful. Whether or not he chooses to do so based on a review of what the remaining evidence would be still against him, that would be for a determination. I see. Okay. So it doesn't matter. We have to look at all of the envelopes and just decide whether they should be suppressed. I think that's correct. The government is proposing, at least, that it might use all of them at trial. The government intended to use all of the envelopes that were not addressed to Mr. Stokes personally at trial, including the open envelopes and the contents of those envelopes. Okay. But we don't know what's inside the unopened envelopes, supposedly. All that can be determined from that, well, the evidentiary basis would be that, and perhaps I need to back up to what the actual charge is, what Mr. Stokes was charged with was a scheme in which he caused fraudulent invoices or were purported to be invoices from these legitimate business organizations, such as the American Dental Association, caused them to be faxed to thousands of dental offices, in the case of the ADA, throughout the United States requesting payment of annual dues, which appeared on their face to be legitimate invoices. The result was a number of these offices were deceived and mailed back checks to the address that was given by Mr. Stokes on these invoices, an address that he had no authority to use for these purposes, that he had no connection with any of these entities. He had no authority to seek payment of dues on behalf of them. So that was the overall scheme. So the government, yes, would use the envelopes to show that he was successful, that as part of the scheme victims were deceived and that they sent payments back, that they went to a post office box that had been rented by Mr. Stokes and that that would further establish that it was Mr. Stokes who was responsible for and had operated the scheme. Okay. I'm going to quote the government's memorandum on this. The government intends to offer in evidence at trial the mail addressed to the various associations or their, quote, member processing departments, as well as the contents of those envelopes so addressed, which were opened by the government with the consent of the sender. Now, counsel segued into a second part of his argument that if that's all you had in terms of the contents, that that is not sufficient to do the loss calculation that the judge, in fact, engaged in here. That was done by taking these letters, the average amount asked for, the number of return envelopes, with an assumption that what was in the envelope was, in fact, a check. Okay. And what is the response to that argument? The government's response on the calculation of the loss, there's several parts to the argument. The first is that the defendant weighed that argument and that it is not a matter for appeal. He did so during the sentencing hearing, at which time the counsel consulted with Mr. Stokes and represented to the court that Mr. Stokes agreed that the loss calculation was approximately, or the loss amount was approximately $400,000, agreed that the court did not have to find the loss amount with precision, but only had to make a reasonable estimate, and agreed specifically as to the guideline calculation and the range that was applicable to him, which was the amount that the government was also seeking, was calculated by the probation office, and which the district court found and began the sentencing process with. So our first argument is that it was waived. With respect to the government's burden of proving what that loss amount was and the evidence that was presented, there was really three parts to it. The first was evidence the government presented as to checks, I believe it's a couple hundred thousand dollars of checks, that Mr. Stokes cashed prior to 2012 as part of this scheme at a check-cashing service. So that was the first prong. The second prong was, as Your Honor indicated, the envelopes that came in. And yes, there were only a handful that were actually opened. The ones that were opened did contain checks. The government pointed out to the court during the sentencing hearing and showed the court the originals, that one could see through many of these checks, they had a little window, and one could see that there was a check inside of that. And the court found reasonably that based on that evidence, that there were another couple of hundred thousand dollars worth of intended loss because of checks mailed in. And the defendant argued and attacked some of those checks during the sentencing hearing, but the court found that even if those checks were thrown out, those envelopes were thrown out, it wouldn't have changed the loss calculation. And the third prong that the government argued was the entire scope of the scheme, which was that there was evidence that Mr. Stokes sent tens of thousands of these fraudulent faxed invoices out to offices around the country, and the potential amount of loss, the intended loss, easily, in addition to the actual amounts we found, easily exceeded the $400,000 break point. In fact, the probation office initially, in its original PSR, concluded that the loss amount should be the entirety of that, the tens of thousands multiplied by the amount that he was seeking for each one and had a proposed loss amount in, I believe it was about 7 or 8 million. Okay, thank you. Going back to the first point, the expectation of privacy in mail not addressed to the defendant, a number of the circuits seem to have adopted a rule, plus or minus, that if it's not addressed to you, you don't have a privacy interest in it, or at least if it's not addressed to you and it's just in a post office box. Is the government really pressing on the facts of this case for a definitive ruling on that point? The government's, I believe it does need to, the court does need to reach that because that was the primary basis that the district court found that Mr. Stokes had failed to establish that he had a privacy interest in this envelope. His affidavit merely stated, one, that he was a renter of this box, and as to all of the mailing locations that he received mail, essentially addressed to him. He made no assertion that he had any privacy interest in mail addressed to anyone else, or in particular in this case, to any of the business associations. The court could conclude that the district court was correct in that Mr. Stokes failed to meet his burden of establishing that he had a privacy interest in any of this. The court, I think, could conclude that even without making the legal ruling that in every case, mail that is not addressed to an individual, that that individual has no Fourth Amendment interest. Saved by the bell. One last question and I'll quite say it. So just as to this, I don't quite know how to think about this, whether anything turns on the fact of the mail being opened. So you could imagine that his privacy interest isn't so great as to say that he has an expectation of privacy that the mail won't be taken by anybody. But with respect to whether it would be opened, do we have any case law that helps us on that question? What's the government's argument as to why he has no expectation of privacy with respect to the opening of the mail once it's arrived at a box that he's set up to be the place where he receives his mail? Because that does seem relatively intrusive for the government not only to be going into your box, but then to be taking it out and opening it up and looking what's in there. There would be several arguments here. The first, with respect to the setting aside the box, there was also mail that would form the basis of counts that were sent to these other addresses. Those were withheld, so they were not taken out of a box or a location that he established any privacy interest in. The only ones from the box, the idea is that the government went into the box, took it out, and then opened it, right? Yes. The record was not fully developed with respect to how many of the envelopes were actually taken out of the box versus those that were withheld. Based on the time stamp on the envelopes, it appears most were not. But the government concedes and advised the defendant below that the three counts that form the basis of the mailings that were sent to that box, those were taken out and were opened. But I understood you to represent that they were opened only after consent was given by the sender. Yes. Okay. I didn't mean to suggest otherwise. I simply meant that as opposed to not, I believe, the envelopes were tested. That's helpful, but I guess I want to understand why the defendant's competing argument about how the general regulatory regime about what counts as a permissible basis for opening mail that you've gotten at the post office box you set up, I think their argument is that shapes the expectation of privacy one has in the box. And so I'm just trying to figure, is the government's contention that they agree with that but those rules and regulations permit mail that comes to your box to be taken out of it and opened so long as the person who sent it says that's okay, even once the mail has reached its destination, is in your box, which you own? The government has several positions with respect to this. The first, starting with the mail that was in the box that the defendant fails to establish Fourth Amendment interest there. Secondly, that the mail was removed explicitly in compliance with a federal court order that the defendant does not contest at all, does not contest the legality of that order, whether it should have been entered or not, and in fact asserts that the government was obligated to follow the order of Judge Wolf. So it was taken out. Once it's taken out, then the question, as Your Honor is asking, what's the authority for opening it? The government relies, and relied at the time of the civil hearing, Postal Inspector Reardon provided an affidavit to Judge Wolf in which he explained his understanding that the postal authorities had the right to open envelopes with the authority, the consent of the sender. Now that is not in the statute, as Mr. Stokes has pointed out. It is contained in the postal regulations. I can't explain the difference between the two and why the regulations provide greater authority than the statute does, but they do. It reflects, I believe, at that time, even the good faith of the postal authorities in seeking the consent to not just open mail, but sought consent of specific ones before doing so. And again, in the end, none of those envelopes were addressed to Mr. Stokes himself. He has no Fourth Amendment interest in anything having to do with opening of that mail. Does that answer your question, Your Honor? If not, I'd be happy to try again. No, I don't know that there's more. I guess, is the point that you say for our purposes in adjudicating the Fourth Amendment claim, we don't have to decide whether that regulation is valid? It's enough for Fourth Amendment purposes to say that since there was a regulation there, there's no Fourth Amendment problem with a Postal Inspector relying on it in doing? I think that's correct, Your Honor. Is there any challenge below to the lawfulness of the regulation? No. No, so we could just say that that's not preserved any challenge to it here anyway? Or do you think that's not true? The memo in support of the motion to express, it was somewhat complicated and confusing, I have to say. So whether or not he specifically cited to that statute, I don't want to represent. It's either there or it's not. But the government's position is no, the court should not reach that point because he has not established a Fourth Amendment interest to even challenge the opening. Thank you. Thank you, Your Honor.